UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

In re: Michele Robinson,                          Case No. 18-31989-KLP
     aka Michele Hewlett                       Chapter 7
     aka Michele Lynette Robinson
     aka Michele Lynette Goode,
        Debtor.

## <u>MEMORANDUM OPINION</u>

This case is before the Court on the motion of the United States Trustee (the "UST") to dismiss the chapter 7 case of Michele Robinson (the "Debtor") with prejudice to refiling another bankruptcy case for two years. After reviewing the submissions of the parties and the evidence and argument presented at an evidentiary hearing held October 26, 2022, the Court finds that the UST's motion should be granted, and the case should be dismissed with a one-year bar to refiling.

## <u>Jurisdiction and Venue</u>

The Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the general order of reference of the U.S. District Court for the Eastern of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.

## History of the Case and Findings of Fact

Prior to the hearing, the parties submitted a joint stipulation of facts.  ECF 85.[1]  The following findings of fact are derived from the joint stipulations, the record, and the evidence admitted during the hearing.[2]

The Debtor commenced her case by filing a voluntary chapter 13 petition (the "Petition") on April 13, 2018 (the "Petition Date").  ECF 1.  When the Petition was filed, the Debtor's assets included: (a) a 100% ownership interest in a parcel of real estate located at 2227 South Whitehill Drive in Petersburg, VA (the "Petersburg Property"); (b) a shared interest with her spouse in a timeshare in Orlando, FL (the "Timeshare"); and (c) a 2011 Hyundai Genesis (the "Hyundai").

The exemptions and secured indebtedness the Debtor listed in her schedules revealed that if this case been filed under Chapter 7, only the Petersburg Property would have had equity for the benefit of unsecured creditors.  The Debtor scheduled the Petersburg Property as having a value of $41,900 on the Petition Date which, after the deduction of an exemption of $10,000 and a $14,704.10 lien in favor of the Credit Union of Richmond (the "Credit Union"), left hypothetical equity of $17,195.90.  *See* ECF 1, Schedules A/B, C, D.  The Petersburg Property was described as a rental property, although in Schedule I the Debtor did not list any rental income.

---

[1] References to "ECF" refer to the Court's Electronic Case File for the Debtor's case.

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052, incorporated by Fed. R. Bankr. P. 9014(c).

The Debtor's chapter 13 repayment plan (the "Plan") was the only plan filed in the Debtor's chapter 13 case.  The Plan was confirmed on September 25, 2018, and provided that the Debtor would pay $840.00 per month for 60 months, for a total of $50,400.00, to the Chapter 13 Trustee ("the Chapter 13 Trustee").  ECF 24.  From those payments, the Chapter 13 Trustee was to pay a crammed down claim on the Hyundai of $8,075.00 and the $14,704.10 claim secured by the lien on the Petersburg Property.  Unsecured creditors were expected to receive a dividend of 24% of their claims; the distribution in a chapter 7 liquidation was estimated at 22.72%.  The Debtor and/or her spouse were to maintain and directly pay the regular contract payment of $365.99 per month for the Timeshare.  *See* ECF 12.[3]  During the Debtor's chapter 13 case, neither the Debtor nor her spouse made a payment on the Timeshare.

The Chapter 13 Trustee objected to the Plan on the basis that the Plan failed to satisfy chapter 13's liquidation test (the "Liquidation Test"), which requires that unsecured creditors in a chapter 7 case receive at least as much as they would have received had the case been filed under chapter 7.  11 U.S.C. § 1325(a)(4).  More specifically, the Chapter 13 Trustee alleged that the Debtor had undervalued the Petersburg Property, which had a tax assessment of $51,900.00, and that accounting for its true value would result in a larger distribution to unsecured creditors.  ECF 16.  For reasons unexplained, the Chapter 13 Trustee subsequently

---

[3] The original Schedule J included a line-item expense of $356.00 for the Timeshare payment.  ECF 1.

withdrew the objection, ECF 23, and the Plan was confirmed.[4]  ECF 24.  Prior to

confirmation, the Debtor made no modifications to the Plan nor did the confirmation

order modify the Plan in any way. ECF 85, ¶ 6.

On October 20, 2021, the Chapter 13 Trustee moved to dismiss the Debtor's

case for default by the Debtor in making payments under the Plan.  ECF 29.  At a

December 1, 2021, hearing on the Trustee's motion to dismiss, the Debtor was

granted 30 days to convert her case to chapter 7 or the case would be dismissed.

ECF 31.  The Debtor moved to convert her case to chapter 7 on December 21, 2021,

ECF 34, and the Court entered an order of conversion the next day.  ECF 36.

The total amount the Debtor paid to the Chapter 13 Trustee was $33,547.07.

ECF 47.  From that amount, Counsel for the Debtor received $4,633.00, the

modified claim secured by the Hyundai was paid $8,862.43, and the Credit Union

received $7,759.90 on its claim secured by the Petersburg Property. *Id*.

Participating unsecured creditors, whose claims totaled $66,381.16, collectively

received a total of $9,813.74. *Id*.  The amount received by unsecured creditors was

approximately 15% of their claims, which is less than the 24% they would have

received under the Plan if it had been completed and is also less than the 22.72%

creditors would have received under the liquidation analysis set forth in the Plan.

---

[4] It would appear that the Chapter 13 Trustee elected to accept the Debtor's valuation of
the Petersburg Property, perhaps after accounting for expenses of administration in
connection with the liquidation analysis.  Accordingly, under the confirmed Plan, unsecured
creditors were expected to receive a total of just under $16,000 (24% of $66,281.16 of
allowed unsecured claims).

On May 15, 2020, more than two years into the chapter 13 case and over a year and a half before the Debtor converted her case to chapter 7, there was a fire at the Petersburg Property.  As a result of the fire, the Debtor made an insurance claim (the "Insurance Claim") with USAA and obtained an actual cash value settlement totaling $91,174.53. ECF 79, Ex. 17.  From that amount, the Debtor received a direct payment of $82,544.03 (the "Proceeds") on July 15, 2020.  USAA wrote a separate check payable to the Credit Union in the amount of $8630.49 to pay the Credit Union's remaining secured claim.  ECF 79, Ex. 22.

The Debtor did not amend Schedules A/B or C to disclose the Insurance Claim or claim any exemption in the Proceeds.  The Debtor did not seek court approval to retain or use the $82,544.03.  It was only after her case was converted to chapter 7, approximately seventeen months after receiving the Proceeds, that the Debtor first amended her schedules to report the fire; however, the amended schedules did not disclose the Insurance Claim or the Proceeds.  ECF 85, ¶ 10.

Following the Debtor's receipt of the Proceeds in July 2020, the Chapter 13 Trustee was informed of the fire in two separate communications.  ECF 85, ¶ 11. On August 8, 2020, Counsel for the Debtor spoke to the Chapter 13 Trustee's director of operations, Ms. Stewart, to inform her of the fire and to determine the balance owed to the Credit Union so USAA could pay off the loan.  Ms. Stewart directed the Debtor to contact the Credit Union directly to obtain the loan payoff.  Ms. Stewart was not advised of the existence of the Proceeds during the conversation.

The second communication to the Chapter 13 Trustee was in the form of a

letter from the Debtor received on August 11, 2020, in which the Debtor wrote:

> USAA sent me this check to pay off the house at 2227 S. Whitehill Dr.
> They spoke with the law firm and this is the amount quoted to them that was
> owed.  If I'm not mistaken another payment was received from me towards
> my bankruptcy since then so the amount should have gone down.  Will they
> send the overage to you or me?

ECF 79, UST Ex. 22, p. 3.  The Chapter 13 Trustee's office returned the enclosed

check to the Debtor because it was made payable to the Debtor and another party,

and the Debtor was advised to contact the Credit Union directly.

No other communications took place between the Debtor and the Chapter 13

Trustee.  The phone call of August 8, 2020, and the letter received on August 11,

2020, along with the Chapter 13 Trustee's instructions that the check should be

directed to the Credit Union, were the only communications between the parties

regarding the fire at the Petersburg Property.  *See also* ECF 85, ¶ 11.

The Debtor's bank statements reflect how the Debtor spent the Proceeds.

ECF 79, Ex. 19, 20.[5]  More than $21,000.00 in bank withdrawals were made within

the first two months of the Proceeds' receipt:

| Date | Account | Description of Transaction | Amount |
|------|---------|---------------------------|--------|
| 07/16/20 | 3710 | Withdrawal Made In A Branch/Store | $3,000.00 |
| 07/23/20 | 3710 | Withdrawal Made In A Branch/Store | $2,500.00 |
| 08/07/20 | 3710 | Withdrawal Made In A Branch/Store | $1,000.00 |
| 08/19/20 | 3710 | Withdrawal Made In A Branch/Store | $1,000.00 |

[5] The statements for two accounts at Wells Fargo were introduced, ending in 3710 and
1451.  Most of the insurance proceeds were transferred from Account xxxxxx3710 to
Account xxxxxx1451 on July 28, 2020, in the amount of $62,413.54.  ECF 79 Ex. 19, 20.
After that date, bank withdrawals and transfers to Account xxxxxx3710 occurred regularly
over the next seventeen months. *Id.*

| 08/19/20 | 1451 | Withdrawal Made In A Branch/Store | $6,000.00 |
| 09/01/20 | 3710 | Withdrawal Made In A Branch/Store | $1,000.00 |
| 09/02/20 | 1451 | Withdrawal Made In A Branch/Store | $5,000.00 |
| 09/15/20 | 1451 | Withdrawal Made In A Branch/Store | $1,800.00 |

*Id*.

The Debtor's bank statements also reflect more than $17,000 in payments to Hyundai- Motor Finance that the Debtor made between July 15, 2020, and January 15, 2022.  ECF 79, Ex. 19.  The Debtor testified that she had been making payments on her husband's behalf for a 2020 Hyundai Palisade (the "Palisade") and paying its associated expenses.  According to the purchase contract for the Palisade, payments were required to commence February 29, 2020. ECF 79, Ex. 79, Ex. 18.  The amount financed totaled $52,193.64. *Id*.  Although it is not clear whether the Debtor was making payments on the Palisade before July 2020, considering that the required payments under the contract between February 29, 2020, and December 29, 2021, totaled $18,756.50, it appears the Debtor has made most of the loan payments due on the Palisade to date.  *See* ECF 79, Ex. 18, 19.[6]

The bank statements also reflect numerous recurring transactions to individuals throughout the period following the Debtor's receipt of the Proceeds, via applications like Cash App and Square. *Id*.  The Debtor testified that many of the recipients were family or friends whom she supported financially and that she also regularly supported an adult son with Crohn's disease throughout this period.

---

[6]At the time of conversion, the Debtor amended schedule J to disclose that she was making the payments on the Palisade.  ECF 42.

When the Chapter 13 Trustee filed the Motion to Dismiss in October 2021,
alleging the Debtor's payment default under the Plan, the Debtor still retained
approximately $11,000.00 of the Proceeds in her savings account. ECF 20, 29. The
Debtor made the following cash withdrawals following the Chapter 13 Trustee's
Motion to Dismiss:

| Date | Acct. | Description of Transaction | Amount |
|------|-------|----------------------------|--------|
| 11/23/21 | 1451 | Withdrawal Made In A Branch/Store | $1,000.00 |
| 11/24/21 | 1451 | Withdrawal Made In A Branch/Store | $3,200.00 |
| 12/21/21 | 1451 | Withdrawal Made In A Branch/Store | $1,000.00 |

ECF 79, Ex. 20. The Debtor's bank statements also show that she received regular
income averaging over $6500.00 per month between her receipt of the Proceeds and
her conversion of the case to chapter 7.

After the conversion of the case to chapter 7, the Debtor amended her
schedules to report the fire, but she did not disclose her receipt of the Proceeds in
her amended schedules.[7] *See* ECF 42. In her amended schedule A/B the Debtor
listed the value of the Petersburg Property at $5000.00 and stated that the
residence was totaled by fire and not habitable. *Id*. The Chapter 7 Trustee filed a
report of no distribution in the chapter 7 case on April 19, 2022. ECF 61.[8]

## **Conclusions of Law**

---

[7] Debtor filed the amended schedules on January 20, 2022, following the conversion of her
case to chapter 7. The amendment added the Debtor's adult son as a dependent and
removed the Timeshare payment. ECF 42, Schedule J.

[8] The Chapter 7 trustee did not take a position on the UST's Motion to Dismiss. *See* ECF
Docket, *generally*. Whether and to what extent the Chapter 7 trustee would have had any
rights under the Insurance Claim and/or the Proceeds is not an issue before the Court. *See*
11 U.S.C. § 348(f)(1) (defining scope of estate upon conversion).

A bankruptcy court may dismiss a case under chapter 7 "for cause" after notice and a hearing.  11 U.S.C.§ 707(a).  Although "cause" is not defined in the Bankruptcy Code, § 707(a) provides three non-exclusive causes: unreasonable delay by the debtor that is prejudicial to creditors, nonpayment of statutory fees, and the failure of the debtor to timely file the information required § 521(a)(1) of the Bankruptcy Code. *Id.*[9]  Most courts, including the Fourth Circuit, have held that "a debtor's bad faith in filing may constitute cause for dismissal under § 707(a)." *Janvey v. Romero*, 883 F.3d 406, 412 (4th Cir. 2018).[10]

In *Janvey*, the Fourth Circuit noted that the Bankruptcy Code "balances the interests of both creditors and debtors in the distribution of an insolvent party's assets" by seeking to pay creditors "to the extent possible" while simultaneously granting a "fresh start to the honest but unfortunate debtor." *Id.* at 410 (citations omitted).  The court cautioned that while there is a need to prevent "serious abuses of the bankruptcy process," the acknowledgment that bad faith may constitute cause for dismissal under § 707(a) also "requires that the remedy of dismissal be reserved for cases of real misconduct." *Id.* at 412.  For that reason, "bad faith exists only where 'the petitioner has abused the provisions, purpose, or spirit of

---

[9] Unless otherwise noted, subsequent references to the Bankruptcy Code or to specific sections are to the provisions of 11 U.S.C. §§ 1-1532.

[10] Citing *Krueger v. Torres (In re Krueger)*, 812 F.3d 365, 370 (5th Cir. 2016) ("[A] debtor's bad faith in the bankruptcy process can serve as the basis of a dismissal 'for cause' . . . ."). In *Krueger*, the Fifth Circuit quoted *Little Creek Dev. Co. v. Commonwealth Mortg. Co. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071 (5th Cir.1986), observing that "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." 812 F.3d at 370.

bankruptcy law.'" *Id.* (quoting *Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205, 207 (3d Cir. 2000)); *see also Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1129 (6th Cir. 1991) (bad faith exists "only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.").

The court in *Janvey* instructed that "[c]ourts must consider the totality of the circumstances underlying each case to determine whether a debtor has acted in bad faith." 883 F.3d at 412. Various courts have developed multifactor tests to determine whether a debtor has acted in bad faith such that cause for dismissal exists;[11] however, none of these tests are absolutes, and "[e]valuating these factors

---

[11] *See, e.g., McDow v. Smith*, 295 B.R. 69, 80 n.22 (E.D. Va. 2003):

> (1) The debtor's concealment or misrepresentation of assets and/or sources of income, such as the improper or unexplained transfers of assets prior to filing;
> (2) The debtor's lack of candor and completeness in his statements and schedules, such as the inflation of his expenses to disguise his financial well-being;
> (3) The debtor has sufficient resources to repay his debts, and leads a lavish lifestyle, continuing to have excessive and continued expenditures;
> (4) The debtor's motivation in filing is to avoid a large single debt incurred through conduct akin to fraud, misconduct, or gross negligence, such as a judgment in pending litigation, or a collection action;
> (5) The debtor's petition is part of a "deliberate and persistent pattern" of evading a single creditor;
> (6) The debtor is "overutilizing the protection of the Code" to the detriment to his creditors;
> (7) The debtor reduced his creditors to a single creditor prior to filing the petition;
> (8) The debtor's lack of attempt to repay creditors;
> (9) The debtor's payment of debts to insider creditors;

and their comparative relevance is a discretionary exercise that is best left to bankruptcy judges." *Id.* Accordingly, the Court must consider the testimony and exhibits admitted at the October 26 hearing, take judicial notice of filings on the record, and consider the relevant factors to determine whether the circumstances existing in this case are sufficient to establish that the Debtor acted in bad faith.

The Debtor's acts and omissions of which the UST complains took place mostly prior to the Debtor's voluntary conversion of her case from chapter 13 to

---

(10) The debtor's "procedural gymnastics" that have the effect of frustrating creditors;

(11) The unfairness of the debtor's use of the bankruptcy process.

*See also In re Griffieth*, 209 B.R. 823, 827 (Bankr. N.D.N.Y. 1996) ("some common factors emerge from the case law. These factors include: (1) debtor's manipulations having the effect of frustrating one particular creditor, (2) absence of an attempt to pay creditors, (3) debtor's failure to make significant lifestyle changes, (4) debtor has sufficient resources to pay substantial portion of debts, (5) debtor inflates expenses to disguise financial well-being, and (6) debtor is overutilizing protections of the Code to the unconscionable detriment of creditors.").

*See also In re Spagnolia*, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995):

1. The debtor reduced his creditors to a single creditor in the months prior to filing the petition.

2. The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle.

3. The debtor filed the case in response to a judgment pending litigation, or collection action; there is an intent to avoid a large single debt.

4. The debtor made no effort to repay his debts.

5. The unfairness of the use of Chapter 7.

6. The debtor has sufficient resources to pay his debts.

7. The debtor is paying debts to insiders.

8. The schedules inflate expenses to disguise financial well-being.

9. The debtor transferred assets.

10. The debtor is over-utilizing the protection of the Code to the unconscionable detriment of creditors.

11. The debtor employed a deliberate and persistent pattern of evading a single major creditor.

12. The debtor failed to make candid and full disclosure.

13. The debts are modest in relation to assets and income.

14. There are multiple bankruptcy filings or other procedural "gymnastics."

chapter 7.  The UST contends that the Debtor committed bad faith by failing to

disclose the existence of the Insurance Claim and her receipt of the Proceeds and by

failing to provide accurate and complete information on her bankruptcy schedules.[12]

More specifically, the UST asserts that the Proceeds were estate property, the

receipt of which resulted in a substantial and unanticipated change in the Debtor's

postpetition financial affairs giving her a duty to disclose their existence.  The UST

argues that the Debtor's failure to do so, coupled with her dissipation of the

Proceeds without  court authority and her subsequent conversion to Chapter 7 after

the funds had largely been expended, requires the dismissal of her case for bad

faith.

Section 1325(a)(4) of the Bankruptcy Code provides that "the court shall

confirm a plan if . . . the value . . . of property to be distributed under the plan on

account of each allowed unsecured claim is not less than the amount that would be

paid on such claim if the estate of the debtor were liquidated under chapter 7 . . . ."

11 U.S.C. §1325(a)(4).  The Debtor's confirmed Chapter 13 plan (the "Plan")

provided that unsecured creditors could expect to receive a dividend of 24% of their

allowed claims, based on an estimated chapter 7 liquidation distribution of 22.72%.

On her schedules, the Debtor valued the Petersburg Property at $41,900.00 as of

the Petition Date.  After subtracting an exemption of $10,000.00 and the Credit

Union lien in the amount of $14,704.10,  $17,195.90 in equity would be available for

unsecured creditors in a hypothetical liquidation under chapter 7, without

---

[12] A lack of candor and completeness in a debtor's schedules is a factor evidencing bad faith.
*See McDow*, 295 B.R. at 80 n.22.

considering associated sale expenses.  Based on this understanding, the Plan was confirmed, as it complied with the Liquidation Test.

Section 1329(a) of the Bankruptcy Code provides that a chapter 13 plan "may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to . . . increase or reduce the amount of payments on claims of a particular class provided for by the plan . . . ."  11 U.S.C. § 1329(a).  The Fourth Circuit has held that "[i]t is well-settled that a substantial change in the debtor's financial condition after confirmation may warrant a change in the level of payments." *Arnold v. Weast (In re Arnold)*, 869 F.2d 240, 241 (4th Cir. 1989).  In *Arnold*, the court pointed out that "Congress did not intend for debtors who experience substantially improved financial conditions after confirmation to avoid paying more to their creditors," noting that it "is especially true here, where under the original Chapter 13 plan, the unsecured creditors were to receive only 20 cents on the dollar for their claims . . .  while [the debtor's] income has escalated nearly 150%." *Id.* at 242.

In *In re Murphy*, the Fourth Circuit held that modification of a chapter 13 plan pursuant to 11 U.S.C. § 1329 may be necessary if a debtor experiences a "substantial and unanticipated" change in financial circumstances.  *Murphy v. O'Donnell (In re Murphy)*, 474 F.3d 143, 150 (4th Cir. 2007).  Whether the change in a debtor's financial circumstances is "substantial" depends on the facts and circumstances of the case.  *In re Ilyev,* Case No. 17-12987, 2022 WL 2965029, at *3 (July 26, 2022).  A change is "unanticipated" if it could not have been reasonably

anticipated at the time of plan confirmation.  *In re Arnold*, 869 F.2d at 243 ("We

adopt the objective test applied in *Fitak* to determine whether a change was

unanticipated: 'whether a debtor's altered financial circumstances could have been

*reasonably anticipated* at the time of confirmation by the parties seeking

modification.'" quoting *In re Fitak*, 92 B.R. 243, 249-50 (Bankr. S.D. Ohio 1988),

aff'd, 121 B.R. 224 (1980)).

The Debtor's chapter 13 plan was confirmed on September 25, 2018.  The fire

that resulted in the destruction of the Petersburg Property occurred on May 15,

2020.  On July 15, 2020, after making a claim on her insurance policy, the Debtor

received a payment from her insurance company in the amount of $82,544.03.  The

amount received by the Debtor was substantial and greatly exceeded the $10,000

exemption the Debtor had claimed in the Petersburg Property.[13] The receipt of the

funds was also unanticipated because neither the fire nor the Proceeds were

foreseeable at the time of confirmation.  Under *Murphy*, grounds existed to modify

the Debtor's chapter 13 plan.

If the Chapter 13 Trustee, a creditor, or the Debtor had moved to modify the

chapter 13 plan pursuant to § 1329 in light of the Debtor's substantial and

unanticipated receipt of the Proceeds, such a modification likely would have

occurred.  The UST contends that neither the Chapter 13 Trustee nor any creditor

was given an opportunity to seek modification of the plan because the Debtor failed

---

[13] *See, e.g., Goodman v. Gorman (In re Goodman),* 534 B.R. 656 (E.D. Va. 2015) (debtor's
inheritance of $36,000 was substantial and unanticipated).

14

to report receiving the Proceeds.  This failure forms the basis of the UST's assertion

of bad faith.

The Debtor contends that she had no duty to amend her schedules or disclose

the Insurance Claim and the Proceeds.  Recently, in *In re Ilyev*, this Court held that

while the Bankruptcy Code and Federal Rules of Bankruptcy Procedure may not

explicitly require the amendment of a debtor's schedules when an asset becomes

property of a chapter 13 estate pursuant to § 1306(a),[14] "[d]ebtors also have a duty

of cooperation with the Trustee.  Section 521(a)(3) requires debtors to cooperate

with trustees as necessary to enable the trustee to perform the trustee's duties

under Title 11." *Id*. at *3.  The Court concluded that "[t]he duty of cooperation under

Section 521(a)(3) and Rule 4002(a)(4) includes a duty of disclosure for substantial

and unanticipated changes in the Debtor's financial condition.  The Chapter 13

Trustee cannot perform his duties, and the Court is not in a position to decide

whether a particular change in financial circumstances may be substantial and

unanticipated, without disclosure." *Id*. at *5.  Thus, even if amending her schedules

to include the Insurance Claim and the Proceeds may not have been technically

required, their receipt required accurate and timely disclosure to the Chapter 13

Trustee.  *See U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 458 (5th Cir. 2006)

(duty to disclose postpetition change in income); *Cotita v. Verizon Wireless*, 54

---

[14] Bankruptcy Code §1306(a)(1) provides that "[p]roperty of the estate includes, in addition
to the property specified in section 54 of this title . . . all property of the kind specified in
such section that the debtor acquires after the commencement of the case but before the
case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title,
whichever occurs first . . . ."  11 U.S.C.§1306(a)(1).

F.Supp.3d 714 (W.D. Ky. 2014) (duty to disclose litigation claims); *In re Pautin*, 521 B.R. 754, 763 (Bankr. W.D. Tex. 2014) (failure to report additional earnings and tax refund not good faith); *see also Waldron v. Brown (In re Waldron),* 536 F.3d 1239, 1245 (11th Cir. 2008) ("The disclosure of post confirmation assets gives the trustee and creditors a meaningful right to request, under section 1329, a modification of the debtor's plan to pay his creditors . . . . If post confirmation assets were not subject to disclosure, modifications for increased payments would be rare because few debtors would voluntarily disclose new assets, and the trustee and creditors would be unlikely to obtain this information from sources other than the debtor.").

The Debtor has also asserted that the insurance policy covering the Petersburg Property is a contractual right between the insurance company and the Debtor and, therefore, neither inures to the benefit of the bankruptcy estate nor represents proceeds derived from the property itself.[15]  This assertion is wrong, as demonstrated by a lengthy opinion out of the U.S. Bankruptcy Court for the Southern District of Ohio addressing factual circumstances similar to those at bar. In *In re Scholl*, 605 B.R. 163 (Bankr. S.D. Ohio 2019), the bankruptcy court addressed a dispute between a chapter 13 debtor and the trustee over insurance proceeds stemming from a fire that destroyed the debtors' rental property during the 59th month of a 60-month plan.  The debtor filed a motion to keep all the

---

[15] "[The USAA policy] is only a contractual right between the insurer and the insured and is of no benefit to third parties not named in the policy. . . . The receipt of fire insurance proceeds was never additional income to the debtor, nor was it after acquired property." Debtor's Memorandum in Support of its Objection to the Trustee's Motion to Dismiss Case with Prejudice to Refiling for Bankruptcy for Two Years, ECF 87, p.5.

insurance proceeds, in the amount of $194,000, for the purpose of replacing the improvements on the property.  The chapter 13 trustee objected and sought modification of the plan to increase the distribution to unsecured creditors.

Initially, the court observed that "there [can be no] serious dispute that the insurance policy that the Debtors owned prepetition is property of the estate, even though they failed to list it on their bankruptcy schedules."[16] *Id.* at 171.  The court also found that proceeds of an insurance policy made payable to the debtor are property of the estate that may inure to the benefit of creditors. *Id.* at 172 (citing*, inter alia, Am. Bankers Ins. Co. v. Maness,* 101 F.3d 358, 364 (4th Cir. 1996)).  For that reason, the court found that the insurance proceeds could only be used by the debtors with court approval. *Id.* at 173.

After considering the totality of the circumstances, the court concluded that "a post-confirmation fire that results in a total loss of the Debtors' Rental Property, which has appreciated in value and leads to a substantial payment from an insurer, constitutes the sort of financial change that justifies a request for an increase in the payments unsecured creditors should receive.  The fire and subsequent demolition of the Rental Property were completely unforeseen, as was the substantial appreciation in value of the Property before it was destroyed.  Those events gave rise to a dramatic change in the Debtor's financial condition post-confirmation, and

---

[16] *Citing Stinett v. Laplante (In re Stinett*), 465 F.3d 309, 312 (7th Cir. 2006) ("As a general matter, insurance contracts in which the debtor has an interest at the time the petition is filed constitute property of the estate for purposes of § 541(a)."). *See also Am. Bankers Ins. Co. v. Maness,* 101 F.3d 358, 362 (4th Cir. 1996) ("[D]ebtors' insurance policies clearly constitute 'interests' under § 541(a) of the Bankruptcy Code.").

that change became subject to the provisions of § 1329." *Id.* at 179.  The court held

that a plan modification that would permit the debtors to retain a "windfall" of

$80,000 while paying only 32 cents on the dollar to unsecured creditors "perverts

the good faith test under § 1325 (a)(3) . . . ." *Id.* at 183.

Just as the court in *Scholl* found when addressing similar facts, here the

Proceeds of the policy insuring the Petersburg Property were property of the

Debtor's chapter 13 estate that the Debtor could use only with court approval.  And,

like the facts in *Scholl*, the fire that destroyed the Petersburg Property was

unforeseen and resulted in a substantial insurance payment, thus triggering the

application of § 1329.

Having found that both the Insurance Claim and the Proceeds constituted

property of the estate and that receipt of the Proceeds stemming from the

destruction of the Petersburg Property represented a substantial and unanticipated

change in the Debtor's financial circumstances, the Court must now review the

Debtor's actions and determine whether dismissal with prejudice is the appropriate

remedy under the circumstances of this case.  The primary consideration here is

whether the Debtor has acted in good faith.[17]

In contrast to the debtor in *Scholl*, the Debtor neither reported the receipt of

the $82,544.03 in insurance proceeds, nor did she seek court approval before

expending the funds.  The Debtor received the Proceeds on July 15, 2020, but did

---

[17]Courts consistently hold that "good faith and candor are necessary prerequisites to
obtaining a fresh start."  *Indus. Ins. Servs., Inc. v. Zick (In re Zick),* 931 F.2d 1124, 1129
(6th Cir. 1991)

not amend her bankruptcy schedules until after her conversion to chapter 7 on

December 21, 2021.  When she did amend her schedules, she reported the fire but

not the receipt of net proceeds of $82,544.03.[18]  Although the Chapter 13 Trustee's

office was advised of the fire in August 2020, it was not made aware that the

insurance proceeds greatly exceeded the payoff of the Credit Union's lien.  Instead,

the Chapter 13 Trustee was told only that the insurance company would pay off the

Credit Union lien.  The Debtor's actions were consistent with the position she is

currently taking, that the Proceeds were not property of the bankruptcy estate and

she had no obligation to disclose them, neither of which is correct.  As a result of her

actions, the Chapter 13 Trustee and her creditors were not afforded the opportunity

to seek a plan modification, and the Court's responsibility to determine the

appropriate disposition of the insurance proceeds was usurped.

During the pendency of her chapter 13 case, the Debtor paid $33,547.07 to

the Chapter 13 Trustee.  Of that amount, counsel to the Debtor received $4633.00,

the creditor whose claim was secured by the Hyundai received $8,862.43,[19] and the

Credit Union received $7759.00.[20]  Unsecured creditors holding a total of $66,381.16

in allowed claims received only $9,813.74.  After her receipt of the insurance

proceeds on July 15, 2020, and before her conversion to chapter 7, the Debtor paid

only $12,600.00 to the Chapter 13 Trustee.

---

[18] The actual cash value of the insurance claim was $91,174.52, ECF 79, UST Ex. 17, of
which the Debtor received a direct payment of $82,544.03 ECF 85, ¶9.  A separate check in
the amount of $8630.49 was written to pay the balance of the Credit Union lien. ECF 79,
Ex. 22.
[19] The secured creditor was paid its full $8075.00 claim plus $787.43 in interest.
[20] The Credit Union was paid its full $6384.29 claim plus $1375.61 in interest.

Evidence presented at the hearing on October 26 reflected that the majority of the Proceeds were expended by the Debtor toward living expenses and payments on her husband's vehicle. The Debtor acknowledged that she used a portion of the Proceeds to support needy family members and friends, including an adult son suffering from Crohn's disease. She further testified that her financial circumstances had significantly changed, resulting in additional living expenses. There was no evidence indicating that the Proceeds were used for luxury items or discretionary expenses.

The Court finds the Debtor's testimony to be credible and accepts the Debtor's representation that the Proceeds she received were primarily used to pay necessary living expenses. However, her lack of candor cannot be overlooked or condoned. Had the Trustee been made aware of the actual amount of the Proceeds, it is likely that she would have sought modification of the Debtor's chapter 13 plan to increase the distribution to unsecured creditors. Instead, the Debtor, perhaps under the mistaken belief that she had no duty to report her receipt of the Proceeds, chose to deprive her creditors and the Chapter 13 Trustee the opportunity to seek an increase in their recoveries. She expended nearly $80,000 in unreported receipts, with only a few thousand dollars remaining before seeking to convert her case to one under chapter 7. Considering the totality of the circumstances, the Court finds that the Debtor failed to act in good faith.[21] Consequently, cause exists to dismiss the Debtor's case pursuant to 11 U.S.C. § 707(a).

---

[21] Bad faith does not require a finding of actual fraud or malice, neither of which appears to have occurred in this case. However, when it is determined that a debtor has acted in bad

The UST seeks dismissal of the Debtor's case along with a bar to refiling

bankruptcy for a period of two years.  The Court agrees that dismissal with

prejudice is an appropriate remedy because it establishes a consequence for the

Debtor's bad faith, provides some relief to her creditors and puts others on notice

that a chapter 13 debtor's failure to disclose unanticipated and substantial changes

in their financial circumstances will result in similar repercussions; however, in the

view of the Court a two-year bar is excessive under the facts of this case.  The Court

will therefore impose a one-year bar to the Debtor's refiling bankruptcy.  *See* 11

U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title.").

## Conclusion

There is no doubt that the Proceeds received by the Debtor during the

pendency of her chapter 13 case represented a substantial and unanticipated

change in circumstances necessitating that her receipt of same be disclosed in her

bankruptcy case.  It was for the Court, not the Debtor, to determine the appropriate

disposition of the Proceeds regardless of the perceived needs of the Debtor and her

dependents.  The Debtor's failure to report her receipt of the Proceeds deprived her

creditors of the opportunity to seek a modification of her Plan and, more

importantly, preempted the role of the Court to determine their appropriate

disposition.

---

faith, it is incumbent upon the Court to preserve the integrity of the bankruptcy process by
refusing to condone it.  *Shell Oil C. v. Waldron* (*In re Waldron*), 785 F.2d 936, 941 (11th Cir.
1986).

For the foregoing reasons, the Debtor's bankruptcy case will be dismissed.

The Debtor will be prohibited from filing a bankruptcy case in this or any other

court for a period of one year.

A separate order will issue.

Signed : March 17, 2023

                                  /s/ Keith L. Phillips
                           United States Bankruptcy Court

Copies:                         ENTERED ON DOCKET: March 17, 2023

Michele Robinson
21301 Trogan Dr
South Chesterfield, VA 23803

Corine E. G. Bailey
Law Office of Corine E.G. Bailey PC
116 N. Sycamore Street
P.O. Box 548
Petersburg, VA 23804

John P. Fitzgerald, III
Office of the US Trustee - Region 4 -R
701 E. Broad Street, Ste. 4304
Richmond, VA 23219

Kathryn R. Montgomery
Office of the United States Trustee
701 East Broad Street, Ste. 4303
Richmond, VA 23219

Jason Brill Shorter
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, VA 23219